No. 62,457

STATE OF KANSAS, *Appellee*, v. JEFFERY L. MEYERS, *Appellant*.

(781 P.2d 700)

Opinion filed October 27, 1989.

*Kevin P. Moriarty*, of Overland Park, argued the cause and was on the brief for appellant.

*Ricklin R. Pierce*, county attorney, argued the cause, and *Susan E. Jones, Richard Hodson*, and *Larry C. Hoffman*, assistant county attorneys, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Jeffery L. Meyers appeals his convictions for second-degree murder (K.S.A. 21-3402) and aggravated battery (K.S.A. 21-3414), claiming: (1) he should not have been prosecuted as an adult; (2) the trial court erroneously failed to instruct the jury on involuntary manslaughter (K.S.A. 21-3404) as a lesser included offense; (3) there is insufficient evidence to support the murder conviction; and (4) his controlling sentence, 12-50 years, is excessive. We disagree and affirm the trial court.

On January 22, 1987, Jeff Meyers shot and wounded Fernando Esquivel and shot and fatally wounded Martin Esquivel. Earlier that evening, Meyers and two friends, Chuck Smith and Mike Hamill, had driven from their hometown of Deerfield to Garden City looking for a fight. After they arrived in Garden City, the trio noticed a red Camaro containing three young women, Lucy and Manuela Esquivel, sisters of the shooting victims, and Lisa Klotz, Martin's girlfriend.

The trio followed the red Camaro to the Esquivel residence and unsuccessfully attempted to engage the women in conversation. When Fernando and his brother, Enrique, emerged from the house, the trio left. As they departed, one of the trio threw some firecrackers. They drove around the block, returned to the residence, threw some more firecrackers, and departed. Responding to the second set of firecrackers, Enrique armed himself with a large club with a spike in it, searched for the trio, and located them. After a brief verbal confrontation, the trio drove back to Deerfield. Mike Hamill, a member of the trio, testified that, while en route back to Garden City, Meyers told him that "if the [Esquivels] fucked with him with them clubs that he'd shoot them."

Meyers testified that the reason for returning to Deerfield was to pick up a rifle, which he had previously stolen. Meyers' intention was "for Chuck to show [the Esquivels] the gun, to have them put down their [clubs], and [for] me and Mike [to] fight a fair fight." After eating dinner at home, Meyers armed himself with the rifle and rejoined Chuck and Mike. The trio drove directly to the Esquivel residence in Garden City, where Chuck threw more firecrackers. Responding to the third provocation, Martin, Fernando, and Enrique engaged the trio in a high-speed car chase which ended when Meyers stopped his car on a secluded road. The Esquivels stopped their car directly behind Meyers' car.

There are two versions of what then transpired. The surviving Esquivels testified that Meyers got out of his car with the rifle, aimed, and shot Fernando and then Martin. Meyers testified that he got out of his car, saw two men coming at him at a fast rate with clubs, took the rifle from the car, and fired two warning shots into the air. Meyers further testified that, after firing the warning shots, he backed away, but the two men kept advancing towards him. He closed his eyes and fired three shots. One bullet hit Fernando in the arm; the other two hit Martin in the chest and head. After the shooting, the trio fled the scene, hid the rifle in an oil storage tank, and then returned to Deerfield.

### Prosecution as an Adult

On the night of the killing, Meyers was 17 years, 11 months old. The Kansas Juvenile Offenders Code allows the district court to authorize the prosecution, as an adult, of any juvenile

who was 16 or more years of age at the time of the alleged commission of the offense if there is substantial evidence that the juvenile should be prosecuted as an adult for the offense charged. K.S.A. 38-1636 (f).

When determining whether prosecution as an adult should be authorized, the court should consider whether the offense was serious; whether it was committed in an aggressive, violent, premeditated or willful manner; and whether it was committed against a person or against property, giving greater weight to offenses against persons, especially if injury resulted. It should also consider the need to protect the community, any history of antisocial behavior or patterns of physical violence, and the number of prior adjudications or alleged adjudications the juvenile has pending as a delinquent or miscreant, weighted by whether the offenses were against persons or property. In addition, the court should consider the respondent's home environment, emotional attitude, and pattern of living or desire to be treated as an adult, and whether facilities or programs are available and are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction. The insufficiency of evidence pertaining to any one or more of the factors shall not, in and of itself, be determinative of the issue. Subject to the provisions of K.S.A. 38-1653, written reports and other materials relating to the juvenile's mental, physical, educational, and social history may be considered by the court. K.S.A. 38-1636(e).

Meyers contends that, even though the alleged offense was a violent act committed with a dangerous weapon which caused the death of one individual and seriously injured another, when considering all the statutory factors, there was not substantial evidence to authorize his prosecution as an adult. Meyers cites a number of cases which state that amenability should be given controlling weight by the judge when first determining if the accused should remain under the juvenile code.

This contention is incorrect. The cases cited by defendant were decided prior to the 1975 legislature's amendment of the predecessor statute to K.S.A. 38-1636, which made a substantial change in the standards for certification of a juvenile for prosecution as an adult. After the 1975 amendment, amenability became just one of the eight statutory factors. The 1975 legislative change placed a greater emphasis on the gravity of the offense

and the protection of the community. *In re Johnson,* 5 Kan. App. 2d 420, 425, 617 P.2d 1273, *rev. denied* 229 Kan. 670 (1980).

Here, the district court considered all eight factors. There is substantial evidence to support the district court's decision that Meyers should have been prosecuted as an adult.

## Involuntary Manslaughter

Although the trial court instructed the jury on self-defense, it refused to instruct the jury on involuntary manslaughter as a lesser included offense of second-degree murder.

Where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced. K.S.A. 21-3107 (3). However, this duty arises only when there is evidence under which the defendant may reasonably be convicted of the lesser offense. *State v. Bishop,* 240 Kan. 647, Syl. ¶ 7, 732 P.2d 765 (1987).

Involuntary manslaughter is the "unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner." K.S.A. 21-3404. Meyers claims that he committed the lawful act of self-defense in an unlawful manner. A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force. K.S.A. 21-3211. The use of excessive force may be found to be an "unlawful manner" of committing the "lawful act" of self-defense, and thereby supply an element of involuntary manslaughter. *State v. Gregory,* 218 Kan. 180, Syl. ¶ 5, 542 P.2d 1051 (1975).

An instruction on involuntary manslaughter may be appropriate where the defendant used a weapon to kill another and claims that he killed that individual in self-defense. Where the threat to an individual's life by another causes such extreme fear or severe mental stress that the individual acts impulsively without an opportunity to reflect, there is no intent to kill and an instruction on involuntary manslaughter is required. *State v. Seelke,* 221 Kan. 672, 680, 561 P.2d 869 (1977). Meyers testified that, although he intended to shoot the Esquivels, he did not

intend to kill Martin. Whether the *shooting* is intentional is immaterial; what controls under the involuntary manslaughter statute is whether the *killing* is intentional. *State v. Gregory*, 218 Kan. at 184.

Meyers argues that the jury could have found that he was entitled to defend himself or it could have found that he used excessive, unreasonable force when defending himself. Following the rationale of *Gregory* and *Seelke*, he argues that the trial court was required to instruct the jury on involuntary manslaughter. After reviewing the facts of *Gregory* and *Seelke*, we disagree.

In *Gregory*, the defendant was charged with second-degree murder and convicted of involuntary manslaughter. The defendant's half-brother operated a tavern. Fullard, the deceased, while fortifying himself for the holiday, claimed that he was shortchanged by the owner. When Fullard pulled a knife, the tavern owner ejected him at the point of a sawed-off shotgun. Gregory, a bystander, took Fullard's change outside and gave it to Fullard's son. Soon afterwards, Fullard called Gregory out of the tavern. Gregory claimed that, when he came out of the tavern, Fullard was coming towards him with a knife that had a "shining" blade. Gregory testified that he attempted to retreat into the tavern. Finding that he could not open the door, Gregory pulled his pistol and shot Fullard in order to stop him, not to kill him. Fullard's knife was found some distance from where Gregory had fired the fatal shot, with the blade closed. At trial, Gregory objected to an instruction on involuntary manslaughter, claiming that the evidence did not support the giving of the instruction and that involuntary manslaughter was not a lesser offense included in second-degree murder.

The *Gregory* court determined that manslaughter is a lesser degree of homicide than murder; therefore, in a murder prosecution, an instruction on manslaughter is required when justified by the evidence. Because Gregory intended to shoot Fullard but did not intend to kill him, an instruction on involuntary manslaughter was proper.

In *Seelke*, the defendant was also charged with second-degree murder and convicted of voluntary manslaughter. Seelke, the defendant, had been subjected to a vicious and brutal attack by her husband. She testified that he had threatened not only her

life but also the lives of her babies. After he had sexually abused and beaten her about the head and body, she obtained a shotgun and fired only to save her life and to protect herself and her children. She claimed to have fired aimlessly to stop her husband and did not intend to kill him. On appeal, Seelke claimed that the trial court erred by refusing to instruct on involuntary manslaughter as a lesser degree of homicide. We agreed and reversed, finding that the circumstances of the provocation gave rise to a legitimate claim of self-defense.

Both in *Gregory* and *Seelke*, the defendants did not provoke the confrontation. In both cases the defendants claimed that they were suddenly faced with a life-threatening situation that required them to take immediate action to avoid the attack by another. Each testified that they shot to stop the aggressor, not to kill him. The facts in this case are not similar to the facts in *Gregory* or *Seelke*. Meyers was not entitled to a self-defense instruction, nor an instruction on involuntary manslaughter under the rationale of those two cases.

The justification to use force in self-defense under K.S.A. 21-3211 is not available to a person who:

"(1) Is attempting to commit, committing, or escaping from the commission of a forcible felony; or

"(2) Initially provokes the use of force against himself or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

"(3) Otherwise initially provokes the use of force against himself or another, unless:

"(a) He has reasonable ground to believe that he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or (b) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." K.S.A. 21-3214.

Relying on *State v. Purdy*, 228 Kan. 264, 615 P.2d 131 (1980), and *State v. Marks*, 226 Kan. 704, 602 P.2d 1344 (1979), the State argues that Meyers intended to commit aggravated assault, *i.e.*, a forcible felony, by using a rifle to disarm the Esquivels. When Meyers wounded Fernando and killed Martin Esquivel, he was committing a forcible felony; therefore, under K.S.A. 21-3214(1), he was not entitled to claim self-defense.

In *Marks*, the defendant, while robbing the Wichita Public Scales Station, shot and killed an attendant. In affirming Marks'

conviction for murder, we stated that "self-defense is not available to a person who is committing or attempting to commit a forcible felony." 226 Kan. at 712. In *Purdy*, the defendant shot and killed a man while burglarizing the man's home. Relying on the prior statement in *Marks*, this court affirmed Purdy's murder conviction. 228 Kan. at 273-74.

Subsection (2) of K.S.A. 21-3214 does not allow an individual who "[i]nitially provokes the use of force against himself or another" to claim he was defending himself. Meyers provoked all confrontations with the Esquivel brothers. After the second confrontation, Meyers temporarily withdrew, returned to his hometown, armed himself with a rifle in order to assault the brothers, and then returned to Garden City. As for the fatal confrontation, the defendant drew the Esquivels from their home and lured them to the secluded area where he intended to physically harm them. In addition, the exceptions of subsections (3)(a) and (b) do not apply to Meyers. Meyers could have avoided the fatal confrontation by remaining in Deerfield.

Meyers was not involved in a sudden, unexpected encounter where he was forced to fire the fatal shots in an attempt to stop two men who were "coming at [him] at a fast rate with clubs." After provoking two prior confrontations with the Esquivels, Meyers returned home and obtained a rifle. He drove back to Garden City intending to use the rifle to force the Esquivels to discard their clubs so he and his friends could beat them. Meyers rationalizes that he was forced to shoot the two men wielding clubs when they unexpectedly ignored his superior deadly weapon and warning shots and continued their attack, leaving him no reasonable means to escape.

Under similar facts in *State v. Cates*, 223 Kan. 724, 576 P.2d 657 (1978), we approved the trial court giving an instruction on self-defense and refusing to instruct on involuntary manslaughter. In *Cates*, there had been several violent confrontations over a four-day period between feuding members and friends of two families. Because of these confrontations and in order to defend himself, Cates carried a homemade "zip gun." The killing occurred during a scuffle inside a car after the deceased, a member of the other family, threatened Cates with a pistol. Cates testified that, while using the pistol as a club to defend himself, it

accidentally fired and killed his antagonist. In affirming Cates' conviction for second-degree murder, this court said:

"Under the facts as testified to by defendant there is nothing in the actions of defendant which would bring the case within the excessive force rationale of [*Gregory*]. If the jury believed his story the homicide was justifiable because he acted in self-defense to repel a deadly force. The trial court did not err in failing to instruct the jury on involuntary manslaughter." 223 Kan. at 729.

Other jurisdictions have determined that, if upon sudden quarrel, parties agree to fight, or fetch their weapons and fight, and one of them is killed, such killing is voluntary manslaughter, no matter who strikes the first blow. See, *e.g.*, *Strickland v. State*, 137 Ga. App. 419, 224 S.E.2d 87 (1976). Meyers was not involved in a sudden quarrel.

The general rule is that the doctrine of self-defense cannot be invoked to excuse a killing done in mutual combat willingly entered into. The individual who willingly provoked the mutual combat is not justified or excused in taking life unless he has withdrawn in good faith, has communicated that withdrawal, and has done all in his power to avert the necessity of killing. *State v. Yeater*, 95 Kan. 247, 252-53, 147 Pac. 1114 (1915). See *State v. Burgess*, 245 Kan. 481, 781 P.2d 694 (1989).

As in *Cates*, the jury did not believe that Meyers was defending himself. Meyers provoked the use of deadly force against himself and then withdrew from harm's way in order to arm himself with a deadly weapon. He then returned to the confrontation and caused the death of one of the combatants. Under the facts, Meyers was not entitled to an instruction on self-defense or involuntary manslaughter. The trial court did not err by refusing to instruct the jury on involuntary manslaughter.

## Sufficiency of the Evidence

Meyers claims that there is insufficient evidence to sustain his conviction for second-degree murder. When the defendant challenges the sufficiency of the evidence to support a conviction, the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of the charge are sustained. *State v. Dunn*, 243 Kan. 414, 429, 758 P.2d 718 (1988).

Meyers testified that, after two confrontations with the Esquivels, he returned to Deerfield to get his rifle. Mike Hamill testified that, while en route back to Garden City, Meyers told him that "if the [Esquivels] fucked with him with them clubs that he'd shoot them." Finally, Meyers testified that, as the two brothers were approaching him from opposite sides of his car, he closed his eyes and fired three times in the direction of the Esquivels. All three shots hit the brothers. The only disputed element is the intent to kill, which the jury resolved against him. There is sufficient evidence to sustain the jury's verdict.

## The Sentence

Meyers challenges his sentence on two grounds: (1) The trial court did not discuss, on the record, the criteria for fixing minimum terms as set out in K.S.A. 21-4606; and (2) 12-50 years is an excessive sentence. He argues that mitigating factors which should have been considered are his youth, his lack of a prior criminal record, and the relative leniency with which his confederates were treated. Chuck Smith was sentenced to one to five years at the Hutchinson reformatory, while Mike Hamill was never charged with a crime.

K.S.A. 21-4606 sets forth seven factors which, while not controlling, are to be considered by a sentencing court in fixing the minimum term of imprisonment. When the sentence exceeds the statutory minimum, it is the better practice for the sentencing court to place on the record a detailed statement of the facts and factors it considered. Failure to place on the record such a detailed statement does not necessarily indicate the sentencing court abused its discretion, and each case is to be considered separately on its facts. *State v. Bennett*, 240 Kan. 575, 578, 731 P.2d 284 (1987). A review of the record reveals that the sentencing judge had the presentence report which addressed the statutory considerations. Prior to sentencing Meyers, the judge inquired whether there were any errors in the report. The trial judge met the minimum requirement of the statute.

The minimum term Meyers could have received for second-degree murder was 5-20 years. K.S.A. 21-4501(b). Since the sentence imposed exceeded the statutory minimum, the better practice would have been for the trial court to have made a detailed record of the factors it considered. Since it did not, the question is whether there was an abuse of discretion.

A sentence imposed by a trial court will not be disturbed on the ground that it is excessive, provided it is within the limits set by law and within the realm of discretion on the part of the trial court, and the sentence is not the result of partiality, prejudice, oppression, or corrupt motive. *State v. Dunn*, 243 Kan. at 434. The sentence imposed was within the statutory limits and Meyers alleged no partiality, prejudice, oppression, or corrupt motive on the part of the trial court. The mitigating factors Meyers offers are unpersuasive. There was no abuse of discretion.

The judgment of the trial court is affirmed.

SIX, J., not participating.